# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELLEN MARIE McCORMICK,<br><br>     Plaintiff,<br><br>  v.<br><br>MARTIN O'MALLEY,<br>Commissioner of Social Security,[1]<br><br>     Defendant.<br>_____/ | Case No. 1:23-cv-01522-SKO<br><br>ORDER ON PLAINTIFF'S SOCIAL SECURITY COMPLAINT<br><br>(Doc. 1) |

## I.    INTRODUCTION

Plaintiff Ellen Marie McCormick ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying her application for Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). (Doc. 1.) The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[2]

## II.    FACTUAL BACKGROUND

Plaintiff was born on February 21, 1974, and has a high school education. (Administrative Record ("AR") 36, 51, 109, 150, 158, 175, 485, 492, 533, 554.) Plaintiff filed a claim for SSI

---

[1] On December 20, 2023, Martin O'Malley was named Commissioner of the Social Security Administration. *See* https://www.ssa.gov/history/commissioners.html. He is therefore substituted as the defendant in this action. *See* 42 U.S.C. § 405(g) (referring to the "Commissioner's Answer"); 20 C.F.R. § 422.210(d) ("the person holding the Office of the Commissioner shall, in [their] official capacity, be the proper defendant.").

[2] The parties consented to the jurisdiction of a U.S. Magistrate Judge. (*See* Doc. 22.)

payments on January 13, 2017, alleging she became disabled on September 1, 2016, due bipolar disorder, depression, hepatitis C, back problems, high blood pressure, and paranoid schizophrenia. (AR 22, 145, 146, 161, 162, 163, 242, 445, 485, 488, 527, 533, 554.)  Plaintiff has since amended her alleged onset date to January 13, 2017.  (AR 23, 78.)

Following a hearing, an Administrative Law Judge (ALJ) issued a written decision on August 9, 2019, finding Plaintiff not disabled.  (AR 178–98.)  Plaintiff sought review of the decision by the Appeals Council, who, on July 13, 2020, vacated the decision and remanded the case to the assigned ALJ to address various issues.  (AR 22, 201–202.)  The ALJ held a hearing and issued a new written decision on March 30, 2021, once again finding Plaintiff not disabled. (AR 208–20.)

Upon review, the Appeals Council again vacated the ALJ's decision due to a lack of proper audio recording of the hearing.  (AR 229–30.)  On remand, the Appeals Council directed another ALJ to be assigned to offer a hearing, address the evidence, take any further action needed to complete the administrative record and issue a new decision.  The new ALJ held a hearing and issued a new written decision on July 14, 2023, again finding Plaintiff not disabled.  (AR 22–37.)

**A.     Relevant Medical Evidence[3]**

In February 2017, Plaintiff presented to establish care for treatment of depression and schizophrenia.  (AR 677–79.)  She noted her previous diagnoses of paranoid schizophrenia and bipolar disorder and reported that she had not been medicated since 2014.  (AR 677.)  Plaintiff was accessed with paranoid schizophrenia and "[c]linically significant depressive symptoms as categorize using depression assessment tool."  (AR 678, 679.)  Risperidone and Lexapro were prescribed to treat her symptoms.  (AR 678.)

Plaintiff underwent a complete mental evaluation with Kara Cross, Ph.D. later that month.  (AR 682–88.)   She complained of "depression, anxiety, irritability, anger, hopelessness, worthlessness, lack of energy, feeling of emptiness, seeing spirits or ghost, distrust of others, feelings of dread, feelings of despair, feelings of guilt, suicidal thoughts, mania, and moodiness."

---

[3] Because the parties are familiar with the medical evidence, it is summarized here only to the extent relevant to the contested issues.

1  Dr. Cross found that Plaintiff's complaints "were somewhat consistent with presentation and/or
2  medical records[,]" as "[a]nger, hopelessness, lack of energy, and moodiness were observed."  (AR
3  683.)  Plaintiff reported that she had been hospitalized for mental health problems in the past, and
4  that she had been involved with the legal system, including assault with a knife.  (AR 683, 684.)
5  Dr. Cross noted that Plaintiff's ability to manage money is impaired, and her relationships with
6  family and friends are "poor."  (AR 685.)  Plaintiff stated that she can dress herself, pick up after
7  herself, sweep with a broom, vacuum, use a microwave, watch television, listen to the radio, use a
8  cell phone, and call friends.  (AR 685.)

       On mental status examination, Plaintiff had adequate eye contact, rapport, concentration, and attention, and she was open and cooperative.  (AR 685.)  Dr. Cross noted the presence of a personality disorder.  (AR 685.)  Plaintiff's thought processes were "disorganized" and "rambling," with a "moody" mood and congruent speech.  (AR 685.)  She was oriented to time, place, and person, but not purpose, and her insight and judgment were intact.  (AR 686.)  Dr. Cross assessed Plaintiff with chronic major depressive disorder with psychotic features, polysubstance abuse in remission, and borderline personality disorder.  (AR 687.)  She opined that Plaintiff was moderately impaired in her ability to: understand, remember, carry out simple one or two-step job instructions; do detail and complex tasks; accept instructions from supervisors; and relate to co-workers and the public in an appropriate manner.  (AR 688.)

       In June 2017, State agency physician Timothy Schumacher, Ph.D., deemed Plaintiff's "depressive, bipolar, and related disorders" severe, finding that Plaintiff was moderately impaired in three of the four functional areas (the "paragraph B criteria") and opining limitations on that basis.  (AR 152, 155–57.)  In August 2017, upon reconsideration, another State agency physician, D. Funkenstein, M.D., reviewed the record and agreed with Dr. Schumacher's assessment.  (AR 169, 172–74.)

       In July 2017, Plaintiff presented for a psychiatric evaluation with Belinda De Shay, N.P.  (AR 705–08.)  Plaintiff complained of psychosis, depression, and anxiety, and reported having taken medication for her mental health symptoms in February or March of that year.  (AR 705.)  Plaintiff stated that she was on injections because she could not remember to take her medications.

3

(AR 706.)  N.P. De Shay found Plaintiff's eye contact intermittent, her thought processes disorganized, her thought content consistent with auditory hallucinations and paranoia, and her insight and judgment poor.  (AR 706.)  The evaluation for attention, concentration, and memory "suggested moderate decline in these mental functioning[s]."  (AR 706.)  Plaintiff's primary diagnosis was schizoaffective disorder, bipolar type, with a secondary diagnosis of generalized anxiety disorder.  (AR 707.)  She was prescribed Risperdal and Zoloft.  (AR 707.)

Plaintiff presented to N.P. De Shay for a follow up appointment in February 2018.  (AR 703–04.)  She reported that she "has been living on the streets for 4 months" and "has not been doing good."  (AR 703.)  She requested Risperdal injections, as she is "unable to remember to take pills regularly."  (AR 703.)  N.P. De Shay indicated that Plaintiff's condition has become worse due to homeless and medication noncompliance.  (AR 703.)  She found that Plaintiff was moderately impaired in "most areas of life function."  (AR 703.)  Her mental status examination results were the same as before, with the addition of poor hygiene, illogical thought content consistent with visual hallucinations, and depressed mood.  (AR 704.)

In March 2018, Plaintiff was referred by her primary care physician for a psychiatric assessment.  (AR 820.)  She reported living in an apartment with her mother, but that they do not get along and she "sleeps in the desert sometimes to get out of the house."  (AR 820.)  Plaintiff had a history of trauma and violence "living on the streets," and engaged in "fighting at jobs [and] stabbing people with knives and ice picks in various confrontation[s]."  (AR 821.)  She endorsed paranoia, irritability, anger, hopelessness, low self-worth, and auditory hallucinations.  (AR 821.)  Plaintiff indicated that her anger and irritability impact her social relationships and ability to maintain friendships.  (AR 824.)  She withdraws from social activities as a result.  (AR 824.)  Mood fluctuations impact her ability to obtain employment, as well as "unstable housing."  (AR 825.)  On mental status examination, Plaintiff exhibited hopeless mood, slow speech, auditory hallucinations, and impaired judgment.  (AR 827–29.)  It was noted her social relationships were severely impaired due to her mental health symptoms.  (AR 832.)

Plaintiff presented for an initial mental health assessment in December 2022, after not having had treatment for the prior two years.  (AR 1473–78.)  She noted previous diagnoses of

paranoid schizophrenia, major depression, and bipolar disorder. (AR 1475.) Plaintiff reported having auditory hallucinations, paranoia, sadness, low motivation, diminished interest, irritability, mood swings, and fatigue. (AR 1475.) She requested medication management and stated that she received "injections every two weeks." (AR 1475–76.) Plaintiff was assessed with paranoid schizophrenia, bipolar disorder, and depression. (AR 1476.)

In May 2023, Plaintiff underwent another mental health assessment. (AR 1491–1520.) She reported feelings of anxiety, racing thoughts, paranoia, and hallucinations. (AR 1491, 1492.) Plaintiff stated that has not taken her medications in 7 years and "struggles" to take them because she "cannot remember to take them" in pill form. (AR 1494.) She also "struggles to attend appointments due to feeling that staff are judging her." (AR 1494.) Plaintiff reported that she has difficulty being around and getting along with others due to her hallucinations, irritability, paranoia. (AR 1495.) She stated she has "a lot" of difficulty performing household chores. (AR 1495.) On mental status examination, Plaintiff had agitated motor activity, a guarded attitude, and was talkative. (AR 1498.) Her thought process was disorganized, racing, tangential, rambling, and involved loose associations and flight of ideas. (AR 1498.) She had an impaired ability to concentrate and was inattentive, with fair long-term memory. (AR 1499.) Plaintiff was assessed with schizoaffective disorder. (AR 1515.) It was again noted her social relationships were severely impaired due to her mental health symptoms. (AR 1518.)

**B.     Plaintiff's and Lay Witness' Statements**

    **1.     Plaintiff's Statements**

Plaintiff completed an Adult Function Report in February 2017. (AR 517–25.) She stated that she needs reminders to take care of personal needs and to take medicine. (AR 519.) When she prepares meals, she forgets and burns the food. (AR 519.) Plaintiff needs reminders to go places. (AR 521.) She stated that she has been in "fights and jail over assaults at work" and has problems getting along with others. (AR 522, 523.)

In July 2017, Plaintiff completed another Adult Function Report. (AR 545–53.) She reported that she lives in a duplex with family. (AR 545.) Plaintiff needed reminders to bathe, and she forgets to cook and to take her medication. (AR 546, 547.) She also reported that she forgets

to pay bills. (AR 548.) Plaintiff sometimes spends time with her mother, but she reports that her mother "avoids" her because Plaintiff is "mean." (AR 549.) She needs reminders to go places, and "can't stand people." (AR 549, 550.) Plaintiff stated that she was fired from an employer because she "beat people up" and went to jail. (AR 551.)

### 2.  Plaintiff's Friend's Statements

Plaintiff's friend completed a Third-Party Adult Function Report in February 2017. (AR 504–11.) She stated that Plaintiff prepares food daily but struggles with forgetfulness and will burn and/or forget food. (AR 506.) Plaintiff needed reminders to go places, did not handle stress or changes in routine well, and did not spend time with others. (AR 508, 510.)

In July 2017, Plaintiff's friend completed another Third-Party Adult Function Report. (AR 536–43.) She stated that Plaintiff needs reminders to take medication and forgets to handle money. (AR 538, 539.) Plaintiff is on guard when out of her house, has problems getting along with others, and does not handle stress well. (AR 541, 542.)

### C.  Administrative Proceedings

The Commissioner denied Plaintiff's application for benefits initially on June 1, 2017, and again on reconsideration on August 21, 2017. (AR 233–36, 242–47.) Following a hearing on July 9, 2019, an Administrative Law Judge (ALJ) issued a written decision on August 9, 2019, finding Plaintiff not disabled. (AR 178–98.) Plaintiff sought review of the decision by the Appeals Council, who, on July 13, 2020, vacated the decision and remanded the case to the assigned ALJ to address various issues. (AR 22, 201–202.) The ALJ issued a new written decision on March 30, 2021, once again finding Plaintiff not disabled. (AR 208–20.)

Upon review, the Appeals Council once again vacated the ALJ's decision due to a lack of proper audio recording of the hearing. (AR 229–30.) On remand, the Appeals Council directed another ALJ to be assigned to offer a hearing, address the evidence, take any further action needed to complete the administrative record and issue a new decision.

### 1.  July 9, 2019 Hearing

At the July 9, 2019, hearing, Plaintiff testified that she has difficulty dealing with people and she experiences paranoia. (AR 54, 60.) Plaintiff had been staying at her mother's home for

a short while, but they do not get along, so she is "homeless." (AR 65.) In 2018, she stopped receiving mental health treatment for her depression, bipolar disorder, and paranoia in 2018 because she "never know[s] where [she's] gonna be at." (AR 66.) She testified she hasn't sought mental health treatment because she is "not stable" and "[doesn't] know where [she'll] be for day to day." (AR 67.) At the time of the hearing, Plaintiff was not taking any medications for her mental illness. (AR 66.) She has "no friends" and only spends time with her daughter. (AR 68.)

A vocational expert ("VE") also testified. (AR 70–75.) Among other things, the VE testified that an individual who was unable to complete an eight-hour workday or who would be off task 20% of the workday could not sustain a full-time competitive job in the economy. (AR 73–74.)

### 2. June 12, 2023 Hearing

At the June 12, 2023, hearing, Plaintiff testified that she was homeless from 2017 to 2020. (AR 109–20.) Her mental illness causes her to get into fights and be paranoid, and she went to prison for stabbing someone. (AR 119.) Plaintiff testified that her paranoia and depression have "progressed" over time, and that she experiences visual and auditory hallucinations. (AR 119–20.) She is "always fighting with somebody," even her "mom, we get into it all the time." (AR 119–20.) Plaintiff testified that she has been on psychiatric mediation "for [her] whole life," including Risperdal. (AR 120.) She forgets to take her medication, so "the [Risperdal] shot is better" because it is time released. (AR 99.)

Psychiatrist Linda Miller, D.O., testified at the hearing as a medical expert. (AR 95–109.) She stated that Plaintiff has a "dual diagnosis of schizoaffective disorder, bipolar subtype" made by Dr. De Shay in 2018, and that the "symptoms in [the May 2023 assessment] completely support De Shay's findings that [Plaintiff] has schizoaffective disorder, bipolar subtype." (AR 97.) Dr. Miller testified that Plaintiff has "pretty significant mental health symptoms" that suggest "chronic underlying psychotic disease despite methamphetamine use." (AR 97, 98.) Dr. Miller further testified that she didn't "know if I can speak to the severity [of Plaintiff's psychiatric disorders] because . . . I would need more." (AR 103.) She concluded that Plaintiff "has a chronic mental illness." (AR 108.)

**D.     The ALJ's Decision**

In a decision dated July 14, 2023, the ALJ found that Plaintiff was not disabled, as defined by the Act. (AR 22–37.)  The ALJ decided that Plaintiff has not engaged in substantial gainful activity since January 13, 2017, the application date (step one).  (AR 26.)  At step two, the ALJ found Plaintiff's following impairments to be severe: morbid obesity; coronary artery disease; chronic obstructive pulmonary disease (COPD) or emphysema; and chronic peripheral venous insufficiency.  (AR 26–28.)  Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") (step three).  (AR 28.)

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[4] and applied the assessment at steps four and five.  *See* 20 C.F.R. § 416.920(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity . . . . We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps."). The ALJ determined that, through the date last insured, Plaintiff had the RFC:

> to perform light work as defined in 20 CFR [§] 416.967(b) except she can stand and/or walk four hours in an eight-hour day; occasionally climb stairs and crouch; frequently stoop, kneel and balance; and must avoid hazards such as ladders and scaffolds as well as crawling and concentrated dust, fumes and chemicals.

(AR 28–35.)  Although the ALJ recognized that Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms[,]" the ALJ rejected Plaintiff's subjective testimony as "not entirely consistent with the medical evidence and other evidence in the record . . . ." (AR 29.)

The ALJ determined that Plaintiff could not perform her past relevant work of assembly line worker and home health worker (step four), but that, given her RFC, she could perform a significant number of other jobs in the local and national economies (step five).  (AR 35–37.)  In

---

[4] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. TITLES II & XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, Social Security Ruling ("SSR") 96-8P (S.S.A. July 2, 1996).  The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. *Id*.  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin*., 466 F.3d 880, 883 (9th Cir. 2006).

making this determination, the ALJ posed a series of hypothetical questions to the VE. (AR 121–24.) In response, the VE testified that a person with the specified RFC could perform the jobs of small products assembler, electronical accessories assembler, and cashier. (AR 122–24.) Ultimately, the ALJ concluded that Plaintiff was not disabled since January 13, 2017, the application date. (AR 37.)

Plaintiff sought review of this decision before the Appeals Council, which denied review on September 14, 2023. (AR 5–11.) Therefore, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. § 416.1481.

### III.     LEGAL STANDARD

**A.     Applicable Law**

An individual is considered "disabled" for purposes of disability benefits if they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). However, "[a]n individual shall be determined to be under a disability only if [their] physical or mental impairment or impairments are of such severity that [they are] not only unable to do [their] previous work but cannot, considering [their] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* at § 423(d)(2)(A).

"The Social Security Regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act." *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520); *see also* 20 C.F.R. § 416.920. The Ninth Circuit has provided the following description of the sequential evaluation analysis:

> In step one, the ALJ determines whether a claimant is currently engaged in substantial gainful activity. If so, the claimant is not disabled. If not, the ALJ proceeds to step two and evaluates whether the claimant has a medically severe impairment or combination of impairments. If not, the claimant is not disabled. If so, the ALJ proceeds to step three and considers whether the impairment or combination of impairments meets or equals a listed impairment under 20 C.F.R. pt. 404, subpt. P, [a]pp. 1. If so, the claimant is automatically presumed disabled. If not, the ALJ proceeds to step four and assesses whether the claimant is capable of performing [their] past relevant work. If so, the claimant is not disabled. If not, the ALJ proceeds to step five and examines whether the claimant has the [RFC] . . . . to perform any other substantial gainful activity in the national economy. If so,

the claimant is not disabled. If not, the claimant is disabled.

*Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *see also* 20 C.F.R. § 416.920(a)(4) (providing the "five-step sequential evaluation process" for SSI claimants). "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520); 20 C.F.R. § 416.920.

"The claimant carries the initial burden of proving a disability in steps one through four of the analysis." *Burch*, 400 F.3d at 679 (citing *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989)). "However, if a claimant establishes an inability to continue [their] past work, the burden shifts to the Commissioner in step five to show that the claimant can perform other substantial gainful work." *Id.* (citing *Swenson*, 876 F.2d at 687).

**B.    Scope of Review**

"This court may set aside the Commissioner's denial of [social security] benefits [only] when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett*, 180 F.3d at 1097 (citation omitted). *See also Ford v. Saul*, 930 F.3d 1141, 1153–54 (9th Cir. 2020). "Substantial evidence . . . is 'more than a mere scintilla,'" and means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, (1938)). *See also Ford v. Saul*, 930 F.3d 1141, 1153–54 (9th Cir. 2020). "This is a highly deferential standard of review . . . ." *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009). "The court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." *Id.*; *see, e.g.*, *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) ("If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the Commissioner.") (citations omitted).

In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings. *See Lewis v.*

*Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).  Nonetheless, "the Commissioner's decision 'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'"  *Tackett*, 180 F.3d at 1098 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998)).  "Rather, a court must 'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'"  *Id.* (quoting *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

Finally, courts "may not reverse an ALJ's decision on account of an error that is harmless."  *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055–56 (9th Cir. 2006)).  Harmless error "exists when it is clear from the record that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'"  *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Circ. 2008) (quoting *Robbins v. Social Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006)).  "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."  *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (citations omitted).

**IV.     DISCUSSION**

Plaintiff contends that the ALJ erred in, among other things, not finding her mental impairments "severe" at step two.  (*See* Doc. 11 at 22–29.)  The Court agrees and will remand the case for further proceedings on that basis.

**A.      The ALJ Committed Harmful Error at Step Two**

**1.      Legal Standard**

"At step two of the five-step sequential inquiry, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments."  *Smolen v. Chater*, 80 F.3d 1273, 1289–90 (9th Cir. 1996) (citing *Bowen v. Yuckert*, 482 U.S. 137, 140–41 (1987)).  "[A]t the step two inquiry, . . . the ALJ must consider the combined effect of all of the claimant's impairments on [their] ability to function, without regard to whether each alone was sufficiently severe."  *Id.* at 1290 (citing 42 U.S.C. § 423(d)(2)(B) and Social Security Ruling ("SSR") 86–8).

"[A]n impairment is not severe if it does not significantly limit [the claimant's] . . . ability to do basic work activities."  *Id.* at 1290 (citing 20 C.F.R. §§ 404.1520(c) & 404.1521(a)).  *See also*

11

20 C.F.R. §§ 416.920(c), 416.921(a). "[B]asic work activities are the abilities and aptitudes necessary to do most jobs." SSR 85–28, 1985 WL 56856, at *3. Examples of "basic work activities" include (1) "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling," (2) "[c]apacities for seeing, hearing, and speaking," (3) "[u]nderstanding, carrying out, and remembering simple instructions," (4) "[u]se of judgment," (5) "[r]esponding appropriately to supervision, co-workers and usual work situations," and (6) "[d]ealing with changes in a routine work setting." 20 C.F.R. § 416.922(b).

"An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on an [individual's] ability to work.'" *Smolen*, 80 F.3d at 1290 (quoting SSR 85–28). Additionally, "an ALJ may find that a claimant lacks a medically severe impairment or combination of impairments only when their conclusion is 'clearly established by medical evidence.'" *Webb v. Barnhart*, 433 F.3d 683, 687 (9th Cir. 2005) (citing SSR 85–28); *cf. Ukolov v. Barnhart*, 420 F.3d 1002, 1006 (9th Cir. 2005) (finding that the claimant "failed to meet his burden of establishing disability" where "none of the medical opinions included a finding of impairment, a diagnosis, or objective test results").

"Great care should be exercised in applying the not severe impairment concept." SSR 85–28. "The Commissioner has stated that '[i]f an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation should not end with the not severe evaluation step.'" *Webb*, 433 F.3d at 687 (alteration in original) (quoting SSR 85–28).

Ultimately, "[t]he severity regulation increases the efficiency and reliability of the evaluation process by identifying at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education, and experience were taken into account." *Yuckert*, 482 U.S. at 153. In other words, "the step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen*, 80 F.3d at 1290 (*citing Yuckert*, 482 U.S. at 153–54). Nonetheless, "[t]he plaintiff has the burden of establishing the severity of the impairment." *Cookson v. Comm'r of Soc. Sec.*, No. 2:12–cv–2542–CMK, 2014

WL 4795176, at *2 (E.D. Cal. Sept. 25, 2014); *see, e.g.*, *Burch*, 400 F.3d at 679 ("The claimant carries the initial burden of proving a disability in steps one through four of the analysis.") (citing *Swenson*, 876 F.2d at 687)).

### 2. Analysis

At step two, the ALJ noted Plaintiff had a "medically determinable mental impairments" of schizoaffective disorder and polysubstance abuse. (AR 26.) Nonetheless, the ALJ found those impairments were not severe because (1) they caused no more than a "mild" limitation in the four functional areas of (a) understanding, remembering or applying information; (b) interacting with others; (c) concentrating, persisting or maintaining pace; and (d) adapting or managing oneself (the "paragraph B criteria"), and (2) "the evidence does not otherwise indicate that there is more than a minimal limitation in the claimant's ability to do basic work activities." (AR 27.) Specifically, the ALJ observed that Plaintiff "prepares her own quick, daily meals," "does household chores," "can go out alone," and "lived with friends and later her mother," "spends time with her friend and mother." (AR 27.)

Viewing the record as a whole, the medical evidence in this case does not "clearly establish" that Plaintiff lacks a medically severe mental impairment. *Webb*, 433 F.3d at 687. In concluding that Plaintiff's mental impairments were nonsevere, the ALJ improperly selectively highlighted those portions of Plaintiff's records that supported the ALJ's conclusion that the impairments were nonsevere, while downplaying or omitting evidence to the contrary. *See Reddick v. Chater*, 157 F.3d 715, 722–23 (9th Cir. 1998) (An ALJ may not "cherry pick" from a record to support the conclusion, but rather must account for the context of the whole record.); *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984) ("Although it is within the power of the [ALJ] to . . . weigh conflicting evidence, he cannot reach a conclusion first, and then attempt to justify it by ignoring competent evidence in the record that suggests an opposite result.).

For example, the ALJ failed to qualify their finding that Plaintiff can prepare simple meals with evidence in the record that she struggles with her memory and will forget to cook or will burn meals. (AR 506, 519, 546.) While Plaintiff "does household chores," the ALJ overlooked evidence that she has "a lot" of difficulty performing them. (AR 1495.) Plaintiff "goes out alone," but the

ALJ neglected to mention that she needs reminders to do so. (AR 508, 510, 521, 549, 550.) The ALJ highlighted the fact that Plaintiff lived with and spent time with her mother but omitted evidence that Plaintiff and her mother fight all the time, that her mother avoids her due to her temper, and that she became homeless because she and her mother do not get along. (AR 65, 549, 820.) In addition, at step two the ALJ wholly ignored the medical opinion evidence (albeit discussed later in the decision) of the State agency physicians and the consultative examiner Dr. Cross, all of whom deemed Plaintiff's mental impairments severe because they caused moderate limitations in Plaintiff's ability to do basic work activities. (*See* AR 52, 155–57, 169, 172–74, 688.)

Thus, when considering the foregoing evidence and the record as a whole (and not just those portions on which the ALJ relies), it is enough to meet the *de minimis* standard posed at step two and to classify Plaintiff's mental impairments as severe. Even if Plaintiff cannot "ultimately succeed in proving [they are] disabled," an ALJ errs at step two if their severity determinations are not supported by substantial evidence. *Telly v. Saul*, No. 1:19-CV-00456-SKO, 2020 WL 5545274, at *11 (E.D. Cal. Sept. 16, 2020). Accordingly, the ALJ's severity determination is not supported by substantial evidence and constitutes legal error. *See Achakzai v. Berryhill*, No. 18-CV-07005-JCS, 2020 WL 1450554, at *21 (N.D. Cal. Mar. 25, 2020) (holding that, because the medical evidence met de minimis step-two standard, ALJ severity determination was not supported by substantial evidence and constituted "legal error"); *Martinez v. Comm'r of Soc. Sec. Admin.,* No. CV-17-0089-PHX-DMF, 2017 WL 5000332, at *16–17 (D. Ariz. Nov. 2, 2017) (holding that, because plaintiff's impairments were "more than de minimis in degree," the ALJ erred by labeling certain of plaintiff's impairments non-severe).

### 3. The Error is Not Harmless

If an ALJ errs at step two, that error is harmless if the ALJ considers the impairment at issue in the RFC analysis. *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007). This is because "[t]he RFC . . . should be exactly the same regardless of whether certain impairments are considered 'severe' or not." *Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017). "In fact, in assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's

14

impairments, even those that are not 'severe.'" *Id*. (internal quotations and alterations omitted); *see Michaud v. Saul*, No. 18-CV-02625-JLS-MDD, 2019 WL 5684411, at *3 (S.D. Cal. Nov. 1, 2019).

While the ALJ did consider Plaintiff's mental impairments in assessing her RFC, that assessment was flawed. In concluding that the "evidence fails to substantiate any limitations posed by [Plaintiff's] mental impairments, the ALJ mischaracterized Plaintiff's overall treatment history as "irregular, infrequent, conservative, and noninvasive." (AR 31.) First, Plaintiff's treatment of psychiatric medications including antipsychotics and antidepressants is neither "conservative" nor "noninvasive." *See Baker v. Astrue*, No. ED CV 09-1078 RZ, 2010 WL 682263, at *1 (C.D. Cal. Feb. 24, 2010) ("Where mental activity is involved, administering medications that can alter behavior shows anything but conservative treatment"); *see also A.B. v. Saul*, Case No. 8:18-cv-00997-SHK, 2019 WL 6139163, at *8 (C.D. Cal. July 23, 2019) (collecting cases stating that treatment with antipsychotic or antidepressant medication does not qualify as "conservative" treatment); *Rice v. Colvin*, No. 2:15-cv-1763 DB, 2017 WL 85815, at *5 (E.D. Cal. Jan. 10, 2017) ("It is entirely unclear to the court how treatment with such medications could be characterized as conservative").

Second, the ALJ found "the records do not show any mental health services after March 2018 until May 2023." (AR 31.) This is incorrect. In December 2022, Plaintiff presented for an initial mental health assessment, at which she reported having auditory hallucinations, paranoia, sadness, low motivation, diminished interest, irritability, mood swings, and fatigue, and was assessed with paranoid schizophrenia, bipolar disorder, and depression. (AR 1475–76.)

But even if the ALJ had been correct about a gap in treatment, the Ninth Circuit has observed that "it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996) (citations and quotations omitted); *see also Garrison v. Colvin*, 759 F.3d 995, 1018 n.24 (9th Cir. 2014) (quoting *Nguyen*); *McTaggart v. Comm'r*, 480 Fed. App'x 459, 461 n.2 (9th Cir. 2012) (reliance on fact that claimant rarely sought mental health counseling as a ground for adverse credibility finding deemed "erroneous in light of *Nguyen v. Chater*"); *Etter v. Colvin,* No. EDCV

13-1540-OP, 2014 WL 2931145, at *2–3 (C.D. Cal. June 26, 2014) (finding ALJ's residual functional capacity assessment not supported by substantial evidence where ALJ gave "little" weight to the psychiatric consultative examiner's opinion and, in doing so, highlighted that the claimant had not received mental health treatment; citing, inter alia, *Nguyen*); *accord Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009) ("a mentally ill person's noncompliance with psychiatric medications can be, and usually is, the result of the mental impairment itself and, therefore, neither willful nor without a justifiable excuse") (internal citations and quotations omitted); *Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006) ("mental illness in general . . . may prevent the sufferer from taking prescribed medications or otherwise submitting to treatment") (internal citations omitted). The record is replete with evidence of Plaintiff's difficulties with medication compliance due to her memory problems. (*See, e.g.*, AR 99, 539, 546, 706.) The ALJ's reasoning also fails to acknowledge that Plaintiff was homeless for three years during the relevant period (*see* AR 65, 67, 119, 703, 825). *See, e.g., Plascencia v. Berryhill*, No. CV 18-3614-E, 2018 WL 5619985, at *10 (C.D. Cal. Oct. 29, 2018).

The ALJ's evaluation of the medical opinion evidence also suffers from the same flaw. The opinions of the State agency physicians and the consultative examiner Dr. Cross were given "little weight" and "less weight," respectively, because Plaintiff's mental health treatment was "scant."[5] (AR 34.) Fully crediting even some of their opined limitations could have led a reasonable ALJ to reach a different disability determination, considering the VE's testimony that a person with Plaintiff's RFC who would be unable to complete an eight-hour workday, or who would be off task more than 20% of the workday, would be unable to perform both Plaintiff's past relevant work and work in the national economy. (*See* AR 73–74.)

By the same token, the ALJ gave "great weight" to medical expert Dr. Miller's opinion that relied on "very limited evidence of mental health treatment."[6] (AR 34.) But even Dr. Miller

---

[5] Plaintiff filed her SSI claim before March 27, 2017, so Section 416.927, not Section 416.920c, governs the ALJ's evaluation of medical opinions. *See* 20 C.F.R. § 416.920c; 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017).

[6] The ALJ also pointed to "overall normal mental status examinations" as reason to accord Dr. Miller's opinion "great weight" (AR 34), but it is not clear to which "normal" examinations the ALJ is referring. Plaintiff's mental status examinations from 2017, 2018, 2022, and 2023 consistently showed ***abnormal*** thought processes, thought content, orientation, judgment, and the presence of auditory and visual hallucinations. (*See, e.g.*, AR 685, 704, 706, 821, 827–29, 1475, 1491–92, 1498.)

acknowledged that, despite the lack of treatment records, the record nevertheless demonstrates Plaintiff has "pretty significant mental health symptoms" that suggest "chronic underlying psychotic disease despite methamphetamine use." (AR 97, 98. *See also* AR 108 (Plaintiff "has a chronic mental illness.").)

In view of the foregoing, the Court cannot conclude that the ALJ's error was harmless. *Stout*, 454 F.3d at 1056; *Molina*, 674 F.3d at 1115. *See also Ruiz v. Saul*, No. CV-18-0292-TUC-BGM, 2019 WL 4594221, at *21 (D. Ariz. Sept. 23, 2019) (holding that ALJ's omission of non-severe impairment from RFC was reversable error); *Michaud*, 2019 WL 5684411, at *5 (same).

## B.  Remand for Further Proceedings is Appropriate

The Court has the discretion to remand the case for additional evidence and findings or to award benefits. *Smolen*, 80 F.3d at 1292. The Court may award benefits if the record is fully developed, and further administrative proceedings would serve no useful purpose. *Id.* Remand is appropriate when additional administrative proceedings could remedy defects. *Rodriguez v. Bowen*, 876 F.2d 759, 763 (9th Cir. 1989). In this case, the Court declines Plaintiff's request for remand for benefits (*see* Doc. 11 at 40) and finds that further proceedings are necessary to properly evaluate the record as a whole, taking into account Plaintiff's treatment history. Accordingly, the Court remands this matter to the Commissioner for further administrative proceedings. *See, e.g.*, *Chavez v. Saul*, No. 2:18-cv-1079-EFB, 2019 WL 4747698, at *6 (E.D. Cal. Sept. 30, 2019) (finding error at step two and remanding for further administrative proceedings).

## C.  The Court Declines to Determine Plaintiff's Remaining Assertions of Error

As the Court finds that remand is appropriate for the ALJ to reconsider the medical and opinion evidence, it does not reach Plaintiff's additional assertions of error. *See Hiler v. Astrue*, 687 F.3d 1208, 1212 (9th Cir. 2012) ("Because we remand the case to the ALJ for the reasons stated, we decline to reach [plaintiff's] alternative ground for remand."); *see also Newton v. Colvin*, No. 2:13–cv–2458–GEB–EFB, 2015 WL 1136477, at *6 n.4 (E.D. Cal. Mar. 12, 2015) ("As the matter must be remanded for further consideration of the medical evidence, the court declines to address plaintiff's remaining arguments."); *Augustine ex rel. Ramirez v. Astrue*, 536 F. Supp. 2d 1147, 1153 n.7 (C.D. Cal. 2008) ("[The] Court need not address the other claims plaintiff raises,

17

none of which would provide plaintiff with any further relief than granted, and all of which can be addressed on remand.").

## V. CONCLUSION AND ORDER

Based on the foregoing, the Court finds that the ALJ's decision is not supported by substantial evidence and is, therefore, VACATED and the case REMANDED to the ALJ for further proceedings consistent with this Order. The Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff Ellen Marie McCormick and against Defendant Martin O'Malley, Commissioner of Social Security.

IT IS SO ORDERED.

Dated: **June 27, 2024**         /s/ *Sheila K. Oberto*
                                 UNITED STATES MAGISTRATE JUDGE